MARY A. FOLEY et al. *v.* W. B. McDONALD et al., Admr.

1. PUBLICATION — HOW MADE TO NON-RESIDENTS UNDER ART. 22, P. 429, REV. CODE OF 1857. — A publication under art. 22, p. 429, Rev. Code, 1857, should be addressed to parties known by their names, and is not sufficient if addressed generally " To the non-resident heirs," etc., without naming such as are known.

2. SAME — COURT SHOULD APPOINT DAY AND NAME NEWSPAPER. — In such case the court should, by order, appoint a day for the appearance of parties, and select the paper in which the publication shall be made.

3. PROCESS — SERVICE AFTER RETURN DAY INEFFECTUAL. — Service of pro-cess after the time to which it is returnable is insufficient.

4. ESTATE OF DECEDENT — DISTRIBUTION OF PERSONALTY NO GROUND FOR A SALE OF LAND TO PAY DEBTS. — It is not admissible, in administering the estate of a decedent, to distribute the personal effects among distributees, and then resort to the land on an allegation that there is no personal estate. In such case means to pay debts must be raised through the refunding bonds, or in some cases by suit on the bond of the administrator for mal-administration, and, until the remedy on them has been exhausted, there can be no resort to the land.

5. SAME — LAND NOT TO BE SOLD WHEN THE ACCOUNTS OF ADMINISTRATOR SHOW ASSETS IN HIS HANDS SUFFICIENT TO PAY ALL THE DEBTS OF THE ESTATE. — Where the accounts of the administrator show him to be chargeable with assets more than sufficient to pay all the debts of the estate, it is not proper to order a sale of land to pay debts, because of alleged insufficiency of personal estate.

6. PAROL EVIDENCE NOT ADMISSIBLE TO SHOW THAT THE DOLLARS ACCOUNTED FOR WERE CONFEDERATE TREASURY NOTES. — It is not competent to show by parol evidence that the dollars and cents accounted for in the probate court meant Confederate treasury notes.

APPEAL from the probate court of Jasper county. EASTLAND, J.

The facts of this case, as viewed by the court, will be found stated in the opinion.

*Geo. L. Potter*, and *Hardy & Acker*, for appellants

The failure to name the parties known in the publication, and the failure of the court by order to fix a day for the appearance of the parties, render the order of sale void. Until the debts were paid, it was money for the administrators to distribute to the heirs ; and it was at their peril, if they did so without the order of the court.   Code, p. 454, § 118. Distribution is not a matter of course ; and should never be made without reserving enough to pay known debts.   This is shown by the prescribed condition of the bond to " refund a due proportion of any debts or demands which may afterward appear against the estate," etc. Ib.  The fact that the slaves distributed were afterward emancipated would not release the parties from liability, in a proper case, to refund after such distribution, such slaves were held at the risk of the distributees.   As the administrators reported, in their account, the receipt of so many " dollars," they are bound for good money ; and it was error to admit proof to excuse

them as having received Confederate money. 42 Miss. 194. As the administrators received, and were liable for, a much larger sum than the whole indebtedness of the estate, it was contrary to the statute to decree a sale of the land, until the administrators and their sureties had been pursued to insolvency. 42 Miss. 449–465. The amounts for which the administrators were liable to the estate, as for moneys received, were as much part of the " personal estate " as any other money due to it ; and that personalty was more than sufficient to pay the debts. The decrees should be reversed, and petitions dismissed.

*Frank Johnston,* for appellees.

Publication was made as to the non-resident defendants ; and citations were served upon David McDonald (one of the defendants), and the appellants. The second assignment of error presents the question whether the heirs are entitled to resist the sale of the lands of the intestate, upon the ground that, but for a distribution of moneys to them, there would be a sufficiency of assets for the payment of debts.

The facts are as follows : During the late war, in the years 1863 and 1864, the administrators sold certain personal property of the intestate under proper orders of court, and received the proceeds of these sales in " Confederate money," or " Confederate treasury notes," this being the only cir-culating medium in the country at the time. After paying a few debts, the administrators found that these funds could not be used any further in discharging debts, and they, therefore, distributed the whole amount on hand, equitably and fairly, among the heirs, taking their receipt, but not taking any refunding bonds. At the time of filing the petitions, the administrators had no assets in hand with which to pay the debts. The heirs objected to a sale of the land, for the reason that the administrators distributed this money as above stated, claiming that it should have been applied to the payment of debts.

It appears that the Confederate money could not be used in discharging the debts of the testator, except to a limited extent, and in fact was thus appropriated by the administrators as far as it would be accepted by creditors. If this money had not been distributed to the heirs it would have perished in the hands of the administrators, and thus have been lost to all the parties in interest. Under the circumstances the money was used for the best possible advantage of all parties in interest.

It is no answer to the petition to say that the lands cannot be sold, because the money has been distributed to the heirs, and that they, the heirs, have not been forced to refund. It was their duty to refund without any legal proceedings, and they thus reply their own failure to fulfill a moral and legal obligation. It is inequitable that the heirs should hold the lands and retain the moneys distributed. And yet they claim that the land is discharged, and insist that a sale must be refused. And, indeed, their proposition goes to this in effect, that the land is discharged by reason of the distribution (termed by the heirs a *devastavit*), and as no refunding bonds were taken, the money distributed cannot be recovered by the administrators. In other words, that the administrators are liable for the money distributed to them.

Is this distribution such a *devastavit* as would entitle the heirs to the position assumed by them? The principle might be invoked by a creditor in a proper case. And in the decisions in this state the question has arisen in cases between creditors and administrators and executors, and in cases where the assets of the estate had been actually wasted, squandered or appropriated by the administrators; and where the heirs claimed that creditors must resort, in the first instance, to the bonds of the administrators before subjecting the lands. But these cases do not apply to the case now presented where the only *devastavit* alleged is a distribution to the heirs. They cannot complain that assets have been wasted when they have been the sole beneficiaries. They cannot be heard to say there has been a

*devastavit* when they have received all the personal assets. Their failure to refund has made it necessary for the administrators to apply for a sale of the lands.

In the case cited by counsel for appellants, Webster v. Parker, the court merely affirms the principle announced in former cases, that where the administrator wasted assets, creditors must, in the first instance, resort to the bond of the administrator before subjecting the lands. In the case now before the court, funds that could not be applied to the debts, and which, if kept, would have perished in the hands of the appellees, were distributed among, and willingly received by, the heirs at law.

A *devastavit* implies in its nature a loss, a waste of assets, and in cases where it involves no willful perversion or waste of assets, and where there is a technical *devastavit*, there must be, in order to bind the administrators, a consequent loss to parties in interest. In this case there has been no loss of assets to the heirs, but, on the contrary, the assets, if not disturbed, would have perished in the hands of the appellees. If the money had thus perished without any fault on their part, and if it had been held, it would have become worthless, nevertheless, from causes beyond the control of appellees ; in that event the heirs would not be permitted to complain. With less reason, then, can they complain that the money has been paid to them, where otherwise it would have perished. But it is insisted that the sums received by the appellees, here accounted for by them as dollars and cents, and they cannot now be heard to correct their accounts.

The evidence was not introduced for the purpose of reducing in amount the sums received by the administrators, or for the purpose of discharging the administrators from any supposed liability, and this is patent from the fact that the value of the funds was not proved. If it had been introduced with this object, the value of the money would have been proved in order that the court might allow the administrators credit for its depreciation.

The evidence was introduced for the sole purpose of explaining to the court why the disposition had been made; namely, that the funds could not be used in paying debts, would have perished if it had been held, and, therefore, the payment to the heirs. It was not competent evidence to reduce the debts against appellees, but it was clearly competent for the purpose stated in explanation of the distinction and as illustrative of the circumstances under which the administrator acted in making this disposition of the money.

SIMRALL, J. :

This is an appeal from the decree of the probate court, licensing the administrators of the estate of John McDonald, deceased, to sell the lands of their intestate, on the allegation of an insolvency of the personal estate.

Two questions are made in this court: 1st. As to insufficient notice of the suit to some of the heirs. 2d. That the administrators did not make out a case warranting a sale of the real estate. The petition states that the intestate left surviving him seven children, besides the petitioners W. B. and George McDonald, the administrators, three of whom, to wit, Margaret McCormick, Elizabeth Reed and Sarah Barber, are non-residents. The amended record shows a publication addressed "to the non-resident heirs of John McDonald, deceased," to the effect that the administrators had filed their petition to declare the estate insolvent, and for an order to sell the real estate, which was issued the 2d October, 1868, and published for five consecutive weeks in the Meridian Gazette. Art. 22 of probate court law, Code (1857), p. 429, requires that when it is necessary to notify a non-resident or absent party who has an interest in the proceeding, and he is a necessary party, "or when the parties in interest are unknown," the court shall make an order appointing a day, in some succeeding term, for appearance, which order shall be published in a newspaper, in the opinion of the court, best calculated to give the notice, etc.

The notice to the non-residents comes short of meeting the demands of the law. 1st. The statute implies a notice to both "known" and "unknown parties;" if the former, the publication should be addressed to them personally; 2d. The law is, the court by "order" shall appoint a day for appearance, and shall select the paper in which publication shall be made. In this case the non-residents were "known," yet the publication was to the "heirs" of the intestate. Nor was there an "order" of the court designating a day for appearance, nor a newspaper named, in which the order should be published. It follows then that the non-resident heirs had not sufficient notice of the suit. Moreover, the injunctions of the first section of the act of 15th January, 1862, was disregarded, which prescribes additional means to the other statutes, as to imparting notice to non-residents. The citation served on David McDonald was for his appearance at the February term, 1867. It was issued 6th January, 1867, received by the sheriff the 28th January, 1868, and personally executed. The service was eleven months after the expiration of the term at which he was intended to be notified to appear. Both the publication and this service were insufficient.

The second question is, was a case made out for the sale of the real estate?

The whole amount of debts registered against the estate amounted, exclusive of interest, to $6,290 55. The administrators distributed slaves, estimated in the appraisement at $17,784. The cash receipts, as shown by their several annual accounts, amounted to $11,547 06, so that they were in the possession of ample assets with which to pay off the creditors, and there could be no reason to so apply the lands if there had been a proper and faithful administration. The condition of the refunding bond covers debts "thereafter appearing," implying that debts have been paid, or that enough ought to be retained for sale, or has been, to meet the debts. It is an utter perversion of the system of administering the estates of decedents, as pre-

scribed in the statutes, to transfer the personal effects and moneys by distribution to the heirs, and then, several years afterward, resort to the lands, on the allegation that there is no personal estate.    It was very early held that distribution was void as against creditors ; that one who had judgment against the administrator could take, in execution, property in possession of the distributee.    That distribution has been made, does not change the order of liability of the real estate.    Means to pay unsatisfied debts must be raised through the refunding bonds, and until remedy has been exhausted on them, and, in some circumstances, on the bond of the administrator for maladministration, there is no right to resort to the lands.    The law imposes upon the administrator, so soon as the condition of the estate shows a necessity for it, the duty of raising money by sale of personal property to liquidate the debts.    It is a violation of his trust to distribute money or property with a knowledge that there are outstanding debts.    44 Miss. 330.

It was offered to be proved, as excuse for distributing the money, that it had been collected in Confederate notes, which were depreciated, and which the creditors declined to receive.    The accounts settled in the probate court do not show of what funds the most of the money consisted.    It is not competent, after these settlements have been made, to show, by parol evidence, that the "dollars and cents" therein stated and accounted for, meant depreciated bank notes, or Confederate treasury notes.    Bailey v. Dilworth, 10 Smedes & Marsh. 404 ; 33 Miss. 553 ; Coffin v. Bramlett, Guardian, 42 ib. 201 ; 41 ib. 411.

In the fourth annual settlement there is a memorandum of $4,801 70 (proceeds of sale of personal effects), "sale for Confederate money."    This is the only mention in these settlements of that sort of money.    If that were entirely rejected from the computation there would still be a large surplus of personal assets after satisfying creditors.    The facts shown do not warrant a sale of the lands.

*Decree reversed and cause remanded.*